Andrew Hudson (DC Bar No. 469817)
(*pro hac vice* application pending)
(202) 326-2213 / ahudson@ftc.gov
Suzanne Barth (MA Bar No. 706122)
(*pro hac vice* application pending)
(202) 326-3317 / sbarth@ftc.gov
Org. 1144, Mailstop CC-5201
600 Pennsylvania Ave., NW
Washington, DC 20580

Local Counsel
John Jacobs (CA Bar No. 134154)
(310) 824-4300 / jjacobs@ftc.gov
Federal Trade Commission
10990 Wilshire Blvd., Suite 400
Los Angeles, CA 90024
(310) 824-4380 (fax)

Attorneys for Plaintiff
Federal Trade Commission

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **Federal Trade Commission**,<br><br>Plaintiff,<br><br>vs.<br><br>**Universal Guardian Acceptance, LLC**, a limited liability company, and<br><br>**Universal Account Servicing, LLC**, a limited liability company,<br><br>Defendants. | No. 21-8260<br><br>**Complaint for Permanent Injunction and Other Relief** |

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1. The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), which authorizes the FTC to seek, and the Court to order, permanent injunctive relief and other relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## SUMMARY OF CASE

2. Defendants Universal Guardian Acceptance, LLC, ("UGA"), and Universal Account Servicing, LLC, ("UAS"), (collectively "Defendants") have provided critical assistance to a deceptive scheme perpetrated by OTA Franchise Corporation, Newport Exchange Holdings, Inc., and NEH Services, Inc., operating under the name "Online Trading Academy" (collectively "OTA").

3. OTA used false and unsubstantiated earnings claims to sell training programs on trading in financial markets to consumers across the United States and abroad. It offered prospective purchasers to finance its training, costing tens of thousands of dollars, through retail installment contracts ("RICs"), which Defendants underwrote, serviced, and/or funded.

4. Defendants knew or should have known that OTA used deception to sell its training programs. Nevertheless, they underwrote, serviced, and/or funded OTA RICs to the tune of hundreds of millions of dollars, furthering OTA's unlawful scheme.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

6. Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

7. The FTC is an independent agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court

civil action by its own attorneys. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

## DEFENDANTS

8. Defendant Universal Guardian Acceptance, LLC, is a Delaware limited liability company with its principal place of business at 603 East Street, Suite 401, Parkville, Missouri, 64152. UGA transacts or has transacted business in this District and throughout the United States.

9. Defendant Universal Account Servicing, LLC, is a Delaware limited liability company with its principal place of business at 603 East Street, Suite 301, Parkville, Missouri, 64152. UAS transacts or has transacted business in this District and throughout the United States.

## COMMON ENTERPRISE

10. Defendants UGA and UAS have operated as a common enterprise while engaging in the unfair acts and practices alleged below. Defendants have conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, employees, and office locations. Because these Defendants have operated as a common enterprise, each of them is liable for the acts and practices alleged below.

## COMMERCE

11. At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

12. Since at least 2005, UAS and UGA underwrote, funded, and serviced many RICs offered by OTA to purchasers of OTA's training programs. Over time, UAS and UGA came to provide these services to numerous OTA franchises, as

well. Defendants have provided these services to OTA even though they knew or should have known that OTA used deception in the sale of its training programs.

## I. OTA's Deceptive Scheme

13. OTA claimed it could teach consumers how to use a patented strategy to make money trading in the financial markets. OTA told consumers that anyone could learn and use its strategy, regardless of skill level and experience, and that those who did were likely to make substantial profits. These claims were unsubstantiated and false.

14. OTA charged consumers tens of thousands of dollars for its training, as did a network of over a dozen OTA franchises. OTA, and many of its franchises, offered to let purchasers finance the training through RICs and directly or indirectly represented that purchasers would be able to repay this debt with profits from OTA's trading method.

15. On February 12, 2020, the FTC sued OTA and certain of its principals in the Central District of California, alleging violations of the FTC Act and the Consumer Review Fairness Act. *FTC v. OTA Franchise Corp.*, No. 8:20-CV-00287 (C.D. Cal. Feb. 12, 2020). The court issued a temporary restraining order and, later, a preliminary injunction against the OTA defendants. *Id.* at Dkt. No. 46 (Feb. 25, 2020) and Dkt. No. 130 (Apr. 20, 2020).

16. On September 11, 2020, the court entered a stipulated final order against the OTA defendants. *Id*. at Dkt. No. 267 (Sept. 11, 2020). The order bars the OTA defendants from making deceptive earnings claims and other misrepresentations, required the turnover of assets and millions of dollars, and required OTA to offer debt forgiveness to consumers who had a balance on their RICs with OTA as of the date of the stipulated order.

## II. Defendants Facilitated OTA's Deceptive Sales

17. UGA has open-ended purchase agreements with OTA under which UGA purchases RICs at pre-arranged discount rates based on the contracts' dollar

amount and the creditworthiness grade that UAS had assigned the consumer. Contracts purchased under these agreements are transferred to UGA shortly after origination. UGA pays OTA an amount based on the creditworthiness and principal amount; it is then entitled to collect all future payments owed by the consumer under the contract.

18. This funding commitment has substantially enhanced OTA's ability to issue RICs to prospective purchasers, including to those consumers who could not pay for OTA's pricy training without the funding that Defendants have facilitated.

19. UAS provides a web portal through which OTA sales personnel input information about consumers' finances. UAS's systems analyze the information and report a letter grade reflecting UAS' determination of the consumer's creditworthiness. OTA sales personnel then offer financing options to the consumer based on the grade UAS reported. Consumers with higher grades can finance a higher dollar amount.

20. Once a RIC is originated by OTA, UAS services the contract, which includes sending statements to consumers, offering online payment options, responding to consumers' inquiries, notifying consumers of payment due dates, and taking payments.

21. UAS provides these services for OTA RICs whether or not purchased by UGA. For contracts UGA had not purchased, UAS remitted the proceeds of collections (less a fee) to OTA. These proceeds have been a substantial component of OTA's income.

22. Defendants' services have allowed OTA and its franchises to make thousands of sales totaling hundreds of millions of dollars.

**III. Defendants Were on Notice of OTA's Deceptive Practices**

23. When UGA and UAS began their relationship with OTA in 2005, they reviewed OTA's advertising. At the time, OTA's public-facing website made earnings claims, including:

- "Congratulations on taking your first step toward making serious money — the kind of money professional traders make every day"; and
- "At my **OTA Workshop** you will walk away with very specific trading strategies, that you can immediately begin using, to generate a life time of **unlimited income**!" (emphasis original).

24. Since early in their relationship with OTA, Defendants have been aware of problems relating to earnings representations used in the marketing of trading training. For example, in a 2007 memo assessing the risk of OTA's Orlando franchise, UGA noted: "[t]he seminar business is an unstable industry because it seems to have many operators that have not been in the business very long and approach it with a 'get rich quick' mentality. This causes heightened AG complaints and a general skepticism from consumers."

25. In 2011, the Securities and Exchange Commission filed a complaint and settlement with BetterTrades, a client of Defendants that, like OTA, sold trading training programs. *SEC v. Long Term-Short Term, Inc. and Freddie Rick*, 1:11-cv-1127 at ¶¶13-14 (E.D.Va., 10/18/2011). The SEC alleged that BetterTrades' marketing conveyed the impression that many consumers had become successful traders using BetterTrades' strategy, and that the company had no basis to make such claims. These allegations should have underscored to Defendants the danger that OTA might use similar deceptive tactics. Yet the SEC's action against BetterTrades did not cause Defendants to change their relationship with OTA.

26. Defendants received information about OTA's deceptive marketing directly from consumers. Since at least 2016, consumers have told Defendants that OTA was making earnings claims, that its methods did not work as advertised, or that they felt deceived by OTA. For example:

- In 2016, UAS employees noted that one consumer claimed to have "lost over $100,000 because of [OTA's] services," and another consumer wanted to stop paying because he was "not making any money" from using OTA's services.
- In 2017, UAS employees noted that a consumer claimed OTA "is a scam, they promised they would be making all kinds of money with the program" and another felt he had been "deceived" into paying for an "expensive and worthless product."
- In 2018, UAS employees reported similar complaints from consumers, including: "consumer wants to know why he isn't making any money. [C]onsumer says that he has done everything that he has been taught to do but hasn't had any success[.] [C]onsumer says that he wants to know if the is real of [sic] if they are 'full of Bologna.'" Another consumer reported OTA promised to "help him make $100/day and $2000/month and he stated he didn't learn anything that helps him making money."
- In 2019, a UAS employee noted that one consumer "claims [OTA] told him that he would be able to make about $2000 a month with their services; feels misled; losing money from the service" and another "feels she was lied to about [OTA's] services and refuses to pay until she profits from the services."

27. High cancellation rates provided Defendants with another red flag about OTA's deceptive marketing practices. Approximately 13% of the consumers who had obtained RICs from OTA between 2016 and 2019 cancelled it outright before their training commenced, indicating that many consumers were skeptical about the representations that OTA made to them.

28. Defendants have also known that most OTA purchasers did not pay off their RICs (all serviced by UAS) within the zero-interest rate grace period

offered in those contracts, despite the strong incentive to do so. The RICs allowed consumers to make only a down payment at the time of purchase and pay the remainder within, typically, two or three years. The RICs carried high interest rates—typically about 18%—following a grace period of 180 to 200 days. Purchasers would pay no interest at all if they repaid the debt in full within the grace period.

29. Approximately 70% of OTA purchasers did not pay their debt in full during the grace period. Nearly half still had not paid in full two years after origination. These figures suggested strongly that purchasers of OTA's training were unable to realize the kind of earnings that OTA advertised. Had purchasers earned the advertised income, they would have been able to pay off their RIC debts promptly and avoid crushing high interest payments.

30. Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe Defendants are violating or are about to violate laws enforced by the Commission because, among other things:

- Defendants continued their unlawful acts or practices despite knowledge of numerous complaints and other warning signs;
- Defendants engaged in their unlawful acts and practices repeatedly over a period of at least five years;
- Defendants remain in the debt financing business, continue to purchase and service OTA RICs, and maintain the means, ability, and incentive to resume their unlawful conduct.

## VIOLATIONS OF THE FTC ACT

31. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

32. Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot

reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

**Count I – Unfairness**

33. In numerous instances, Defendants have underwritten, serviced, and funded RICs that they knew or should have known were the product of OTA's deceptive sales practices.

34. Defendants' actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

35. Therefore, Defendants' acts or practices as set forth in Paragraph 34 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

**CONSUMER INJURY**

36. Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff requests that the Court:

A. Enter a permanent injunction to prevent future violations of the FTC Act by Defendants; and

B. Award any additional relief as the Court determines to be just and proper.

Respectfully submitted,

J. REILLY DOLAN
Acting General Counsel

Dated: October 19, 2021

Andrew Hudson
Suzanne Barth
Org. 1144, Mailstop CC-5201
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-2213 / ahudson@ftc.gov
(202) 326-3317 / sbarth@ftc.gov

John Jacobs
Federal Trade Commission
10990 Wilshire Boulevard, Suite 400
Los Angeles, California 90024
(310) 824-4300 / jjacobs@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION